McMURTRY v. COMMISSIONER OF INTERNAL REVENUE.

No. 4649.

United States Court of Appeals
First Circuit.

April 13, 1953.

A. Harding Paul, Washington, D. C., for petitioner.

Morton K. Rothschild, Sp. Asst. to Atty. Gen. (Charles S. Lyon, Asst. Atty. Gen., and Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., on brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

In this case we are presented with the troublesome problem of determining to what extent a postnuptial marital property settlement executed in contemplation of divorce is subject to the gift tax. The tax year in question is 1942.

As has often been observed, the gift tax was enacted as a complement to the estate tax, and was designed to safeguard the revenue to be derived from the estate tax by minimizing the opportunities of depleting one's estate through the device of tax-free voluntary *inter vivos* transfers. The present gift tax was passed as Title III of the Revenue Act of 1932, 47 Stat. 245. Section 501 of the Act imposed a tax upon the transfer during the calendar year by any individual "of property by gift." Section 503 of the Act provided: "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall, for the purpose of the tax imposed by this title, be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year." But the gift tax in terms contained no criteria for determining what was to be deemed "an adequate and full consideration in money or money's worth". However, § 303(a) (1) of the Revenue Act of 1926, dealing with the estate tax, 44 Stat. 72, as amended by § 805 of the Revenue Act of 1932, 47 Stat. 280, provided that for the purpose of the estate tax the value of the net estate should be determined by deducting from the value of the gross estate such amounts "* * * for claims against the estate, * * * as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered, * * *. The deduction herein allowed in the case of claims against the estate, * * * shall, when founded upon a promise or agreement, be limited to the extent that they were con-

tracted bona fide and for an adequate and full consideration in money or money's worth." And § 804 of the Revenue Act of 1932, 47 Stat. 280, at the same time amended § 303(d) of the Revenue Act of 1926 by adding a new sentence reading as follows: "For the purposes of this title [i. e., the estate tax], a relinquishment or promised relinquishment of dower, curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration 'in money or money's worth'." The corresponding provisions of the estate tax are now found in § 812(b) (3) of the Internal Revenue Code, 26 U.S.C.A. § 812(b) (3), and the corresponding provisions of the gift tax are now found in § 1000 and § 1002 of the Code, 26 U.S.C.A. §§ 1000, 1002.

Merrill v. Fahs, 1945, 324 U.S. 308, 65 S.Ct. 655, 656, 89 L.Ed. 963, was a gift tax case involving an antenuptial agreement pursuant to which a man, in contemplation of marriage, made a transfer of property to his wife-to-be in consideration of her release of her prospective marital rights. The Court noted that the same language, "an adequate and full consideration in money or money's worth", occurred in both the gift tax and the estate tax; that since the two taxes are in *pari materia,* the common phrase should be construed the same way both for gift tax and estate tax purposes. It thought that the explicit provision inserted in the estate tax in 1932 to the effect that relinquishment of marital rights "shall not be considered to any extent a consideration 'in money or money's worth' ", was one of "cautious redundancy" 324 U.S. at page 312, 65 S.Ct. at page 656, and that even without this specific provision Congress undoubtedly intended the requirement of "adequate and full consideration" to exclude relinquishment of dower or other marital rights, so far as concerned the estate tax. Therefore, applying the same presumed meaning to the identical language of the gift tax, the Court concluded that the transfer to the wife-to-be, pursuant to the antenuptial agreement, was not to any extent supported by a consideration "in money or money's worth"; and hence was subject to the gift tax to the full value of the property transferred. This court, at an earlier date, had made a similar holding in Commissioner v. Bristol, 1 Cir., 1941, 121 F.2d 129.

So much for antenuptial agreements. In Harris v. Commissioner, 1950, 340 U.S. 106, 71 S.Ct. 181, 183, 95 L.Ed. 111, the Supreme Court for the first time had to do with the gift tax consequences of a postnuptial property settlement negotiated in contemplation of a divorce. The agreement between husband and wife provided for the transfer of certain property by each to the other in satisfaction of all marital rights possessed by the respective transferees. It was expressly provided that this settlement should not become operative in any manner nor binding upon either party "unless a decree of absolute divorce between the parties shall be entered in the pending Nevada action"; and that the settlement agreement should be submitted to the divorce court "for its approval". Further, it was provided that "the covenants in this agreement shall survive any decree of divorce which may be entered." A decree of absolute divorce was entered by the Nevada court, which decree adopted and approved the proposed settlement worked out by the parties and ordered "that said agreement and said trust agreements forming a part thereof shall survive this decree." Subsequently, the reciprocal transfers were made by the divorced parties. The Commissioner sought to impose a gift tax on the ex-wife on the theory that she had made a taxable gift to her ex-husband in the amount by which the value of the property she transferred to him exceeded in value the property which he transferred to her. The Supreme Court, however, held that the whole transfer was exempt from the gift tax. It pointed out that, under the provisions of the estate tax above quoted, a claim against the estate, in order to be deductible from the gross estate, needed to be supported by " 'an adequate and full consideration' " only "when founded upon a promise or agreement". In line with the accepted policy of construing the gift tax and estate tax as in *pari materia,* the majority opinion in effect interpolated into the gift tax this qualifying estate tax phrase, "when founded upon a promise or agree-

ment". Since the binding effect of the settlement was conditional upon the entry of the divorce decree, and the divorce court approved the terms of the settlement and directed its consummation, it was the Supreme Court's view that the divorce decree rather than the agreement of the parties was the primary basis of the taxpayer's obligation to make the transfers; that the transfers were not therefore "founded upon a promise or agreement" and hence under the statute did not have to be supported by "'adequate and full consideration'". In response to the government's contention based on the fact that the terms of the agreement were specifically designed to "survive" any decree of divorce, the Court said, 340 U.S. at page 111, 71 S.Ct. at page 184 that "the gift tax statute is concerned with the source of rights, not with the manner in which rights at some distant time may be enforced."

Both parties in the present case place much emphasis upon the opinion in Harris v. Commissioner—the taxpayer claiming that he comes squarely within the Harris rule, the government claiming that McMurtry's case is distinguishable because here the agreement of the parties was not by its terms made conditional upon the entry of a divorce decree. The Tax Court, with three judges dissenting, adopted the government's view, and found that there was a substantial deficiency in petitioner's gift tax for 1942.

Before stating in detail the facts of the present case, we indicate our general point of view, as follows: Property settlements in contemplation of divorce lack the familiar characteristics of a gift. They are usually the product of arm's-length bargaining negotiations between the parties or their representatives. If the parties cannot work out and submit to the divorce court the terms of an agreed property settlement—which they might naturally prefer to do if possible—the divorce court, if empowered by state law to do so, will make one for them.[1] Therefore in a real sense such settlement agreements are not "voluntary", nor in the donative spirit, but rather are made under the compulsion of the impending divorce decree, the marriage having gone on the rocks. The motive of such transfers is certainly not to deplete the estate *inter vivos*, so as to escape ultimate estate taxes upon death. The basic purpose of the gift tax is not served by taxing transfers of this nature. For these reasons, the precedent of Harris v. Commissioner, holding the particular divorce settlement there involved to be exempt from the gift tax, should not, we think, be applied narrowly and limited to its precise facts. The distinction which the Commissioner has sought to take in the case at bar seems to us insubstantial, and the product of undue refinement. "If finer, more legalistic lines are to be drawn, Congress must do it." 340 U.S. at page 112, 71 S.Ct. at page 184. We read Harris v. Commissioner more broadly as supporting the proposition that, to the extent that the statute does not explicitly command adherence to meaningless formalities, all transfers agreed upon in contemplation of divorce and executed after approval by a divorce court having jurisdiction to give such sanction or in its discretion to prescribe some different property settlement, should be exempt from the gift tax. Some would go even further in exempting these separation agreements from the gift tax. See Pedrick, The Gift Tax Jurisdiction of the Divorce Court, 46 Ill.L.Rev. 177 (1951).

Without further preliminary comment, we now recite the essential facts of the case at bar.

In June of 1933, in apparent contemplation of a divorce from his first wife, Mabel Post McMurtry, petitioner made a separation agreement with her, providing for the creation of a trust to compensate her for her relinquishment of support, dower, and other marital rights. The agreement also provided that, in the event of a subsequent divorce, the terms of the agreement might be incorporated in the decree, but that they were not to be modified in any manner what-

1. As in the case of the Nevada court which granted the divorce in the case at bar. See Nev.Comp.Laws (Supp.1931–1941) § 9463, quoted in Harris v. Commissioner, 340 U.S. at page 109, 71 S.Ct. at page 183.

soever. By an indenture of the same date, June 30, 1933, the trust was set up, consisting of a corpus then worth about $720,000. Hereinafter it will be referred to as the Mabel Trust. Under its provisions Mabel was to receive $2,500 a month for life or, if she availed herself of her right at any time to withdraw $60,000 in a lump sum, the subsequent monthly payments were to be cut down to $2,275. Petitioner retained the remainder interests in the trust.

About four months after this transfer in trust had been effectuated, petitioner obtained an absolute decree of divorce from Mabel in a Maine court. The divorce decree made no mention of the trust or separation agreement and contained no provision for alimony.

Shortly thereafter petitioner sought a ruling concerning the income and gift tax consequences of this transfer. He was advised that he would be taxable on all the income from the trust, but that the transfer was not subject to the gift tax.

On October 25, 1933, soon after the divorce from Mabel, petitioner married Louise Hunt. In 1935 a daughter was born to them. About six years later petitioner and his second wife came to a parting of the ways. The parties on May 21, 1942, drew up a separation agreement providing for the creation of two trusts for the benefit of Louise, in consideration of her release of all marital rights or claims against petitioner. The agreement contained the following paragraph:

> "In the event that at any time hereafter a final judgment or decree of divorce shall be rendered between the parties in a court of competent jurisdiction, whether of this or any other state, this agreement shall remain in full force and effect, and the provisions hereof may be embodied in such judgment or decree if the court granting such decree shall deem proper."

Pursuant to this agreement and on the same date, George McMurtry signed two indentures of trust, naming the Chase National Bank of New York as trustee.

The first trust, valued at $150,637.50, gave to Louise $500 a month, payments to begin September 1, 1942, and to continue for her life or until she remarried; any excess income as well as the remainder interest to go to the daughter, and in the event of her death to go to her issue or to certain other specified remaindermen. This trust will hereinafter be referred to as Louise Trust No. 1.

The second trust consisted of a one-third interest in the remainder of the aforementioned Mabel Trust, created in 1933. Under it Louise was to receive $500 a month for life, or until she remarried, beginning at Mabel's death. It was provided that the surplus income and the remainder interest were to go to the daughter or other specified remaindermen. This trust will hereinafter be referred to as Louise Trust No. 2.

Immediately after signing the separation agreement, Louise Hunt McMurtry went to Nevada to take up residence with a view to obtaining a divorce. Seven weeks later, on July 13, 1942—which was about as promptly as the law allowed—Louise obtained an absolute decree of divorce out of the Nevada court. The decree recited that the parties had theretofore, on May 21, 1942, entered into a written agreement for the custody and support of the minor child, for the support of the wife, and in settlement of the property rights of the parties; and ordered that the said agreement "be, and the same hereby is, approved."

In his gift tax return for 1942 petitioner listed the two Louise Trusts, but he reported himself taxable only on the remainder interests passing thereunder. It was his claim that the life interests transferred to Louise were exempt from the gift tax.

The Commissioner issued a deficiency notice in the sum of $63,138.83. He contended that the full corpus of Louise Trust No. 1 was taxable; and that, in creating Louise Trust No. 2, petitioner had made a taxable gift equal to the value, as of July 20, 1942 (the date of the actual transfers) of a one-third interest in the Mabel Trust, after subtracting the value of Mabel's outstanding life interest. Also, in computing the above deficiency, the Commissioner reversed the Bureau's 1934 ruling and treated the full value of the life interest given to

Mabel in 1933 as a prior gift, which had the effect of putting the 1942 gifts into a higher bracket, in view of the cumulative character of the gift tax.

By the time the case came before the Tax Court in 1948, the Commissioner had receded somewhat from his original position and reduced the amount of the claimed deficiency to accord with E.T. 19, 1946-2 C.B. 166, issued subsequent to the date of the deficiency notice sent to McMurtry. This ruling was that both for estate and gift tax purposes, in the case of "transfers made pursuant to legal separation agreements or divorce decrees," a release of support rights may constitute a consideration in money or money's worth; but that that portion of any transfer which is allocable to the release by the wife of her property or inheritance rights is to be considered as not made "to any extent" for an adequate and full consideration in money or money's worth. The explanation given for this ruling was as follows: "Under a decree of divorce or legal separation a husband's duty to support a divorced wife (alimony) customarily lasts only during the joint lives of the parties or until the divorced wife remarries. * * * The fulfillment, therefore, of this obligation by the husband merely amounts to the liquidation of a presently existing obligation, the satisfaction of which does not have the effect of diminishing or depleting the husband's estate to any greater extent than the payment of other existing legal obligations. On the other hand, a transfer to a wife under such a decree in settlement of inheritance rights is a present transfer of what would otherwise constitute a major portion of the husband's estate on death."[2]

To the extent that E.T. 19 failed to differentiate between transfers "founded upon a promise or agreement" and transfers pursuant to a divorce decree, the ruling has necessarily been modified by the decision in Harris v. Commissioner, supra. But where the transfer is founded on a "promise or agreement" which effectuated a relinquishment of marital rights, we do not, nor does either of the parties in the present case, question the validity of the distinction taken in E.T. 19 between a relinquishment of support rights and a relinquishment of inheritance rights, such as dower or curtesy or a statutory estate created in lieu of dower or curtesy. We think the Commissioner's view is reasonable that the surrender of support rights does not fall within the meaning of the phrase "or of other marital rights *in the decedent's property or estate*" [italics added], as found in I.R.C. § 812(b)(3).

In the order now under review, the Tax Court determined that "there is a deficiency in gift tax for the taxable year ending December 31, 1942, in the amount of $43,804.18."

We think the Tax Court erred in this determination in so far as it was based upon a holding that the interests in income given to Louise Hunt McMurtry in 1942 by petitioner's transfers to Louise Trust No. 1 and Louise Trust No. 2 constituted taxable gifts to her. It is true, as the Tax Court pointed out, that the settlement agreement entered into by the petitioner and Louise as of May 21, 1942, did not in terms purport to be contingent upon the entry of a subsequent decree of divorce. If the transfers had been consummated prior to the entry of such divorce decree, we would have had a different case; then, it would have been difficult to escape the conclusion that such transfers would have been "founded upon a promise or agreement" within the meaning of the estate tax language imported by implication into the gift tax by the decision in Harris v. Commissioner, supra. See 340 U.S. at page 109, 71 S.Ct. at page 183.

█ But that is not what happened here. It was stipulated in the Tax Court, and that court so found, that for valuation purposes "the effective date of these transfers in trust was July 20, 1942 when the properties comprising the principal of the two trusts were transferred to the trustee by the petitioner." It may perhaps be inferred, as petitioner indeed offered to prove, in a motion for re-

2. E.T. 19 was issued in 1946. Since 1942 is the tax year involved in the case at bar, we do not have to consider the possible effect of the liberal marital deduction provisions in I.R.C. § 812(e), added to the estate tax in 1948, 62 Stat. 117.

hearing which the Tax Court denied, that it was the understanding of the parties that Louise Trust No. 1 and Louise Trust No. 2 were to become operative, and the transfers of securities thereunder were to be made, only in the event that there was a divorce decree entered in the Nevada court. However that may be, the fact remains that the transfers in trust were not made until one week after the entry of the divorce decree under which the Nevada court gave its stamp of approval to the terms of the property settlement negotiated by the parties. We think, therefore, that within the meaning of the ruling in Harris v. Commissioner the "source" of the rights and obligations of the parties must be attributed to the divorce decree rather than to the "promise or agreement". In that view, the transfers to Louise in 1942 were not to any extent taxable gifts. This conclusion is fortified by the further consideration that the Court in Harris v. Commissioner, 340 U.S. at page 110, 71 S.Ct. at page 184 cited with approval the analogous estate tax case of Commissioner v. Maresi, 2 Cir., 1946, 156 F.2d 929 where again, the settlement agreement of the parties was not expressly made contingent upon the subsequent entry of a divorce decree but where in fact a divorce decree was later issued in which the terms of the agreement were fully adopted, ratified and approved by the court.

We agree with the Tax Court that in the computation of the gift tax liability for the calendar year 1942 the Commissioner correctly departed from his 1934 ruling to the effect that the transfer in trust to Mabel in the preceding year was not a taxable gift. See Commissioner v. Disston, 1945, 325 U.S. 442, 449, 65 S.Ct. 1328, 89 L.Ed. 1720. Petitioner indeed does not challenge the taxability of the 1933 transfer as an original question, since that transfer was perfected prior to the entry of any divorce decree, and was wholly independent of it. Consequently it is clear that while the statute of limitations prevents the government from presently collecting a tax on this transfer, there is nothing to prevent it from now considering this transfer to be a prior gift for the purpose of determining the appropriate tax bracket into which the 1942 gifts of remainder interests should fall.

It remains only to consider certain questions of valuation presented on the pending petition for review.

Petitioner objects to the Commissioner's valuation of the prior gift to Mabel in 1933. The Commissioner first determined, by the use of actuarial tables, the value of Mabel's life interest in the Mabel Trust, and then, pursuant to the distinction taken in E.T. 19, subtracted therefrom the value of Mabel's support rights. Apparently, in computing the value of these support rights, the Commissioner proceeded on the rough-and-ready theory that those monthly payments to be made to her from the date of the creation of the trust until the earliest of the following events, (1) her death, (2) her remarriage, or (3) petitioner's death, are to be assumed to be in consideration for her relinquishment of her rights of support; and that the remaining payments are to be attributed to her relinquishment of dower, or similar marital rights in petitioner's property or estate. We suppose that the rationale of this method of computation is that normally a husband's duty to support his wife only exists while they are both alive, and, in the case where a divorce has supervened, only until the ex-wife remarries. Petitioner, on the other hand, claims that the computation of the support rights should also take account of such factors as the husband's income and assets, as indeed is indicated in E.T. 19 itself. He also claims that in Maine—where the divorce from Mabel occurred—a divorced husband's support obligations do not cease at his death.

Whatever may be the merit of these points, petitioner did not see fit to introduce any additional evidence dealing with this aspect of the case. In fact, petitioner's own expert witness calculated Mabel's support rights in the same way as did the Commissioner. Nevertheless, petitioner argues to us that since the Commissioner changed his position after issuing the deficiency notice so as to reduce the amount of the claimed deficiency to harmonize with his later ruling in E.T. 19, the burden of proof was thereby shifted to the

Commissioner properly to establish the value of Mabel's support rights, which burden he did not sustain. This does not strike us as persuasive. While this argument as to burden of proof may be applicable where the Commissioner changes his position so as to assert increased deficiencies, or perhaps to justify a previously asserted deficiency on new grounds, we do not think it is also applicable where the Commissioner's change in position, as here, operates in the taxpayer's favor. Cf. Marx v. Commissioner, 1 Cir., 1950, 179 F.2d 938. Counsel for petitioner certainly was informed of the Commissioner's change of position no later than the opening of the trial before the Tax Court, and so far as appears he made no attempt to get any continuance at that time on the ground of surprise. In view of his failure to introduce any better evidence, we think that petitioner cannot now question the Tax Court's adoption of the Commissioner's valuation of Mabel's support rights.

[9] Petitioner also has made a broadside attack upon the actuarial and interest factors used by the Commissioner in making the various calculations. In his original gift tax return for 1942, the taxpayer computed the values of the remainders in Louise Trusts No. 1 and No. 2 (which were all that he considered subject to the gift tax) by taking the lump-sum premiums which a commercial insurance company would charge to provide the life interests given to Louise, and then subtracting these from the total amounts of the respective transfers in trust. Since these commercial insurance premiums were much higher than the figures indicated in the tables provided in the regulations, petitioner thereby obtained a minus amount for the value of the remainder in Louise Trust No. 1, and a figure somewhat under $10,000 for the value of the remainder interest in Louise Trust No. 2.

It seems clear that this method of calculation used by petitioner was improper, since there is a "loading factor" (representing the company's commissions and other expenses) included in every commercial insurance company's premiums. It was also improper since the lower interest rates used by most of these insurance companies are largely due to the fact that their investments are usually considerably restricted by state law.

Rejecting, as we must, the method of calculation used by petitioner, we still must consider, briefly, the challenge which petitioner has sought to make to the actuarial and interest factors used by the Commissioner, as specified in the regulations (Reg. 108, § 86.19(g). At the hearing before the Tax Court, petitioner presented two expert actuarial witnesses whose testimony, in substance, was that the actuarial data on which the tables in the regulations were based is obsolete; that the tables do not distinguish between male and female lives, despite the recognized actuarial fact that the so-called life expectancy of a woman of a given age is approximately the same as that of a man five years younger; and that the 4 per cent interest rate specified in the regulations is completely out of line with current practice and wholly unreasonable.

These arguments are not novel. In large part they have already been considered and rejected by a number of courts. See, e. g., Koshland's Estate v. Commissioner, 9 Cir., 1949, 177 F.2d 851; du Pont v. Commissioner, 1943, 2 T.C. 246, 256–260; Estate of Bartman v. Commissioner, 1948, 10 T.C. 1073, 1078–1079. Cf. also Commissioner v. Maresi, 2 Cir., 1946, 156 F.2d 929, 931. Moreover, petitioner's contentions were carefully examined by the Tax Court in the present case, and we are not persuaded to upset its conclusions. The whole problem of valuing individual life interests by resort to mortality tables is at best a matter of educated guesswork. The courts cannot demand perfection in an area so fraught with speculation and uncertainty. The fact is also not to be disregarded that as late as 1952—ten years after the agreed valuation date of the interests here in question—approximately three-fourths of the states were still using for state inheritance tax purposes the same actuarial table used by the Commissioner, or else the American Experience Table compiled in 1868, which is not much better from petitioner's point of view. See 1 Prentice-Hall, Inheritance and Transfer

Tax Service, p. 801 (1952). We think, therefore, that tables which have enjoyed such widespread and long-standing use should not be rejected as wholly unreasonable, even though they may perhaps be susceptible of minor improvements in particular respects.[3] Such discrepancies as may exist will no doubt average out in the long run; and while this may sometimes prove to be unfortunate for individual taxpayers, the discrepancies may have to be suffered in the interest of a simplified overall administration of the tax laws. Indeed this very case illustrates that proposition, for while in the valuation of the 1942 remainder interests petitioner may be put to disadvantage by the application of the table used by the Commissioner, he stands to gain by the application of that table in the valuation of the 1933 life interest given to Mabel. This may be the reason why the petitioner's own expert used his own set of tables when valuing the 1942 transfers, but was content to apply the tables used in the regulations with respect to the 1933 transfer.

 We do not think that the. Tax Court erred in accepting the 4 per cent interest factor used by the Commissioner. The evidence indicated that virtually all the states in 1942 used an interest factor of 4 per cent or even higher for inheritance tax purposes. Moreover, in view of the broad investment powers conferred upon the trustees in the two Louise Trusts, it would perhaps not be unreasonable to anticipate a 4 per cent average yield. We think that petitioner was in no way prejudiced by the use of the 4 per cent interest rate.

The judgment of the Tax Court is vacated and the case is remanded to that Court for further proceedings not inconsistent with this opinion.

WOODBURY, Circuit Judge (dissenting in part).

I quite agree that this case must be remanded to the Tax Court for further proceedings. But in doing so I would condemn

as arbitrary and capricious the use of tables compiled in 1836 resting upon experience with the life span of insured English males as the basis for computing the life expectancy of two American females a century or so later.

---

3. The Commissioner in 1952 adopted revised mortality tables for application to transfers made after December 31, 1951 (Reg. 108, § 86.19(f). But it does not follow that the older tables should be rejected as arbitrary and unreasonable as applied to transfers made in 1942.