MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY and John R. Norris, Trustees under Deed of Trust dated June 22, 1956, as amended July 7, 1964, from Henry F. Bremer, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 71–1180–H.

United States District Court,
D. Maryland.

Jan. 7, 1974.

Cleaveland D. Miller, Baltimore, Md., for plaintiffs.

Edward J. Snyder, Tax Div., Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., and Michael E. Marr, Asst. U. S. Atty., Baltimore, Md., for defendant.

HARVEY, District Judge:

In this civil action, plaintiffs, who are trustees under an inter vivos deed of trust, are seeking a refund of federal estate taxes previously paid. At issue is whether such trustees are entitled to an estate tax credit for property previously subjected to estate taxation, pursuant to § 2013 of the Internal Revenue Code of 1954, 26 U.S.C. § 2013.

A husband and a wife died within a short time of each other, and the credit claimed is for the wife's life estate in an inter vivos trust previously created by the husband who predeceased the wife by a period of some three weeks. The Internal Revenue Service disallowed a substantial portion of the credit claimed and assessed additional estate taxes and interest. Plaintiffs paid the assessment in question and are seeking in this action to recover the amount paid, together with certain other sums allegedly due because of expenses incurred in bringing this action.[1]

Henry F. Bremer, a resident of Baltimore, Maryland, died on October 3, 1965. On June 22, 1956, he had created an inter vivos revocable deed of trust, naming Mercantile-Safe Deposit & Trust Company and John R. Norris as Trustees and reserving to himself a life estate. Under such deed of trust, as later amended on July 7, 1964, a marital trust and a residuary trust were created at the settlor's death. Norma J. Bremer, the settlor's wife, was given a life estate in the residuary trust, and it is that particular life estate which is involved here. Mrs. Bremer died on October 29, 1965, some twenty-six days after her husband. As the entire corpus of the residuary trust was included in the gross estate of her husband for the purpose of computing the federal estate taxes due by him, a credit was claimed by Mrs. Bremer in her estate tax return under § 2013, based upon the value of her life estate in such trust.

The government concedes in this case that the wife is entitled to a credit under § 2013 in some amount. The dispute arises as to the proper means of valuing for estate tax purposes the property interest of the wife in the residuary trust at the time of her husband's death. Plaintiffs contend that under applicable Regulations the value of Mrs. Bremer's life estate on October 3, 1965 (on which date she was nearly 68 years of age) was $105,761.28. The government, on the other hand, contends that under the Regulations and the evidence produced at trial the value of such property interest on the date in question was $12,022.-00.

§ 20.2013–4 of the Regulations [2] provides in pertinent part as follows:

"(a) For purposes of section 2013 and §§ 20.2013–1 to 20.2013–6, the value of the property transferred to the decedent is the value at which such property was included in the transferor's gross estate for the purpose of the Federal estate tax (see sections 2031, 2032, and the regulations thereunder) reduced as indicated in paragraph (b) of this section. If the decedent received a life estate or remainder or other limited interest in property included in the transferor's gross estate, the value of the interest is determined as of the date of the transferor's death on the basis of recognized valuation principles (see especially §§ 20–2031–7 and 20.2031–10.)"

§ 20.2031–7 provides in pertinent part as follows:[3]

"(a) In general (1) For estates of decedents dying on or before Decem-

1. A claim for refund was first filed with the District Director of Internal Revenue in Baltimore, Maryland, and thereafter this suit was timely filed when no action on the claim was taken within six months by the District Director.

2. The Treasury Regulations pertaining to an estate tax credit for property previously taxed appear in 26 C.F.R. §§ 20.2013–1, et seq.

3. § 20.2031–10 covers the valuation of limited property interests for decedents dying after December 31, 1970.

ber 31, 1970, except as otherwise provided in this subparagraph, the fair market value of annuities, life estates, terms for years, remainders, and reversions is their present value determined under this section."

In this case, plaintiffs initially sought summary judgment, claiming that no extrinsic evidence was admissible for the purpose of valuing Mrs. Bremer's life estate in such trust but that the interest in question should be valued solely in accordance with the actuarial tables contained in the Regulations. Under § 20.-2031(f), Table I, the figure to be used in valuing a life estate owned by a person at age 68 is .29750. In opposing plaintiffs' motion for summary judgment, the government claimed that the value of the interest in question should be determined on the basis of recognized valuation principles which would permit the introduction of evidence to show in a particular case that the actuarial tables should not be strictly applied. The government argued that at her husband's death Mrs. Bremer had no more than a year to live and that the figure to be used is .033816, which is that shown in Table II for a one year term certain. In support of its position, the government filed an affidavit of Dr. Francis W. Gluck and a statement that he had supplied the attorneys for the plaintiffs. Following a hearing, this Court denied the motion for summary judgment, ruling that under Estate of Lion v. Commissioner, 438 F.2d 56 (4th Cir. 1971), a factual dispute existed requiring a trial.[4] See also Merchants National Bank of Topeka v. United States, 369 F.Supp. 1080, 32 AFTR 2d ¶ 147, 870 (D.Kan. June 19, 1973).

In the *Lion* case, a husband and wife were killed at the same time in an airplane crash near Cairo, United Arab Republic. The wife claimed an estate tax credit under § 2013, based upon the actuarial value of her life estate in the re-siduary trust created by her husband's will. In the Tax Court, the Commissioner's argument that the life estate in question had no value was sustained. On appeal, the Fourth Circuit affirmed, and in construing the applicable Regulations said this (438 F.2d at 60):

"While the regulations indicate that *ordinarily* the value of a life estate is to be determined by the use of actuarial tables, the use of tables is subject to the underlying premise that what is sought to be achieved is value 'as of the date of the transferor's death on the basis of recognized valuation principles.' That the tables may or may not reflect 'recognized valuation principles' is implicit in the use of the phrase 'see *especially* § 20.2031-7' (emphasis added), rather than an imperative phrase, for example, 'as determined by § 20.2031-7,' or an expression of like import. The regulations thus leave room for departure from strict application of the tables." [Emphasis in original]

In agreeing with the Tax Court's determination that the special circumstances existing at the time of the husband's death rendered the wife's life estate valueless, the Fourth Circuit said the following (at p. 62):

"We conclude, therefore, that in the exceptional case the actuarial tables in the regulations need not be applied. Where at the time of the transferor's death it was unmistakable to one in possession of the facts that the transferee's life would be radically shorter than predicted in the actuarial tables, the value of a transferred life estate may be reduced accordingly for purposes of calculating the tax credit under § 2013."

A reading of the Regulations themselves suggests three possible approaches to the problem of valuing a life estate for the purpose of determining the

---

4. Plaintiffs thereafter took the deposition of Dr. Gluck, the government's principal witness, and then filed a second motion for summary judgment. No hearing was held on this second motion, which was denied for the reasons stated in a Memorandum and Order dated August 27, 1973.

amount of a credit for property previously taxed. First, it might be contended that the actuarial tables are merely evidentiary and that medical and other proof should be admissible in every case for the purpose of establishing the value of the property interest in question. The government concedes that such an approach is an improper one and would in fact be contrary to the essential purpose of the tables. The Regulations and Tables in question were adopted as an administrative convenience for both the government and taxpayers and were designed to avoid the expense and delay which would result if in every case the value of the interest were required to be proved by extensive medical and other evidence relating to the specific life involved.

A second approach was that argued by plaintiffs in support of their motion for summary judgment, namely that the actuarial tables must be used in every case without exception. This rigid rule was rejected by the Fourth Circuit in *Lion.* Citing Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929) and United States v. Provident Trust Co., 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793 (1934), the Fourth Circuit in *Lion* noted that departure from mortality tables has been consistently allowed in cases involving the determination of the size of charitable remainders for purposes of a charitable deduction from an estate tax (438 F.2d at 60). Various Tax Court decisions were next cited which departed from strict application of actuarial tables where there is reasonable certainty that use of the tables would violate reason and fact. Estate of Jennings v. Commissioner, 10 T.C. 323 (1948); Huntington National Bank v. Commissioner, 13 T.C. 760 (1949); Estate of Butler v. Commissioner, 18 T.C. 914 (1952), and Estate of Hoelzel v. Commissioner, 28 T.C. 384 (1957).

■ Thus, the Fourth Circuit has adopted a third and intermediate approach which lies between the two extremes outlined hereinabove. Under the *Lion* rule, the actuarial tables in the Regulations need not be applied "in the exceptional case", which is defined as a case in which at the time of the transferor's death it was "unmistakable" to one in possession of the facts that the transferee's life would be radically shorter than predicted in the actuarial tables. (438 F.2d at 62). Presumably, a taxpayer likewise could invoke this rule in the exceptional case. Thus, such a rule could be expected to apply in cases where unmistakable facts would indicate a radically longer transferee's life as well as in cases where such facts would indicate a radically shorter life than predicted in the actuarial tables. However, departure from the tables is permissible only "where there is reasonable certainty that use of the tables would violate reason and fact". (438 F. 2d at 61).

■ Here, it is the government which has taken the position that this is the exceptional case, claiming that one in possession of the facts would have unmistakably known that Mrs. Bremer's life would be radically shorter than predicted in the tables. In a case of this sort, the taxpayer has the burden of proof in showing that the Commissioner's determination was in error. Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935). Here, the taxpayers met that burden when the stipulated facts were accepted in evidence and when the taxpayer then relied on the actuarial tables which ordinarily apply. The government then assumed the burden of going forward with evidence to show that this is one of the exceptional cases in which the tables should not be applied.

■■ After considering all the evidence in the case, this Court finds that it would not have been unmistakably clear to one in possession of the facts on October 3, 1965 that Mrs. Bremer's life expectancy was radically shorter than the actuarial tables show. From the evidence produced, it is not reasonably certain that use of the tables would violate reason and fact.

The government rests its case essentially on the testimony of Dr. Francis W. Gluck. Dr. Gluck had treated both Mr. and Mrs. Bremer for many years prior to their deaths. In an affidavit and a letter submitted in opposition to plaintiffs' motion for summary judgment, Dr. Gluck indicated that he did not believe that on October 3, 1965 Mrs. Bremer would have lived another year because of the condition of her liver and kidneys, although he noted that her death was immediately caused by a stroke which was unrelated to such condition. However, when his deposition was taken on March 22, 1973 and again when he testified at trial, Dr. Gluck quite candidly conceded that this estimate of Mrs. Bremer's life expectancy was not a medical opinion and that he did not feel qualified to give any such opinion with any degree of accuracy.[5] When first asked by government counsel at the trial whether he had an opinion concerning Mrs. Bremer's life expectancy on October 3, 1965, Dr. Gluck replied that he did not, and on cross-examination he again testified that he had no opinion in this regard.[6] Although he had treated Mrs. Bremer for some 16 years prior to her death, Dr. Gluck testified that it was pure "guesswork" as to how long she actually might live after her husband died and that he could not put a specific time period on the remaining length of her life. In summarizing his views concerning his patient's life expectancy on October 3, 1965, Dr. Gluck said that his position in the matter was accurately described by the following testimony he had given at the time of the taking of his deposition:

"A. Sir, if I can put this in the record, it has been my rule throughout the practice of medicine never to put a time on anybody's life. I am not a doctor who can tell a family, your husband is going to die at such and such a time, or he has so many weeks or months to live. I have stuck my neck out too many times earlier and had it stepped on, and I have learned that you just can't do it with any degree of accuracy, and if you can't, there is not much point in making such statements, so I just don't do it."

From the evidence produced, this Court concludes that this is not one of those exceptional cases in which the standard tables should not be used. At most, the evidence indicates that Mrs. Bremer, because of a drinking problem, had suffered from poor health over a period of many years during which time she had been hospitalized on several different occasions.[7] After each hospitalization, she recovered remarkably well. Dr. Gluck was concerned over the years with the condition of her liver and kidneys, but the actual cause of her death was a cerebral vascular thrombosis, or stroke, which she suffered approximately one week before she died. Dr. Gluck testified that this cerebral accident could have happened to anyone and was not related to any of her other medical problems.

On the evidence here, Mrs. Bremer must be considered as one of those within the normal range of those average lives used to compute the actuarial figures contained in Table 1. In spite of her alcoholic tendencies and her hospitalizations, Dr. Gluck described the state of her health in 1965 as a little better than the average for her years. The fortuitous event of her early death would not require that some other meas-

---

5. Dr. Gluck testified that the statement relied upon by the government was "not spontaneous".

6. In its Memorandum and Order of August 27, 1973, this Court noted that the weight of Dr. Gluck's opinion had been considerably lessened by the deposition taken by plaintiffs' attorney, but ruled that only at trial could the Court determine the final weight to be accorded the testimony of this important government witness.

7. Dr. Gluck's records indicate that her abuse of alcohol was sporadic and that on most occasions when he examined her it did not appear that she had been drinking excessively. Her liver damage had initially occurred when by mistake she swallowed carbon tetrachloride.

uring stick than the usual tables should be used. Quite obviously, some 68-year old individuals die much sooner than the median expectancy and others survive many years longer. But the mere fact that such a person as Mrs. Bremer has died somewhat sooner than average figures would suggest would not make hers the exceptional case. Only where unmistakable facts would indicate that the life in question would be radically shorter than predicted should there be a departure from the usual standard. The Treasury Regulations and the actuarial tables prescribed thereunder afford a reasonable norm and some degree of certainty in ascertaining the value of property and the consequent tax liabilities of beneficiaries thereof. Miami Beach First National Bank v. United States, 443 F.2d 116, 119 (5th Cir. 1971). As the Court pointed out in McMurty v. Commissioner of Internal Revenue, 203 F.2d 659, 667 (1st Cir. 1953), individual discrepancies which may result from the use of the tables "may have to be suffered in the interest of a simplified overall administration of the tax laws."

What is necessary to prove an exceptional case is illustrated by the facts of those cases in which it has been held that the actuarial tables should not be used. In the *Lion* case, a simultaneous death was involved whereby both husband and wife were hurtling to their deaths in the same airline crash at the very instant that the life estate was to be valued. The facts in Estate of Jennings v. Commissioner, *supra,* indicated that on the valuation date involved, the life tenant, who died two months thereafter, was helpless, with complete loss of memory and almost total paralysis as the result of a cerebral attack. In Estate of Hoelzel, *supra,* the beneficiary at the time of decedent's death was suffering from an incurable and inoperable cancer of the lung and her surgeon and physician were both of the opinion that she would die within a year. Estate of

Butler v. Commissioner, *supra,* involved a decedent's widow who was suffering from cancer in an inoperable and incurable form on the date of the husband's death. In Estate of Denbigh, 7 T.C. 387 (1947), the life beneficiary was suffering from cancer in an inoperable form and in fact lived only two months, although medical experts had testified to a life expectancy of from one to two years.

In Continental Illinois National Bank & Trust Co. v. United States, 32 AFTR 2d ¶ 147, 849 (N.D.Ill.1973), the decedent was seventy-five years of age and was afflicted with incurable cancer of the colon. In spite of testimony by two of the three physicians at the trial that she would live for no more than six months after January, 1966, the Court found that it was possible on February 21, 1966 that she could have lived for another year and ruled that the actuarial tables should be used to value the life estate in question. In Miami Beach First National Bank v. United States, *supra,* the Fifth Circuit reversed a district court valuation of a charitable remainder interest on the basis of highly speculative testimony, concluding that the lower court should have applied the appropriate table "which necessarily deals with probabilities but is applicable indiscriminately to all individuals, and incorporates in its statistics the fortuities of premature death as well as longevity." (443 F.2d at 120).

Not even the Treasury Department's own suggested standard would permit the government to prevail in this case. In Revenue Ruling 66–307, 1966–2 Cum. Bull. 429, the rule was stated as follows:[8]

> "However, if it is known on the valuation date that a life tenant is afflicted with a fatal and incurable disease in its advanced stages and that he cannot survive for more than a brief period of time, the value of the life or re-

8. This Revenue Ruling concedes that the fact that the life tenant may survive the decedent by only a short period of time is not controlling.

mainder interest should be determined by reference to such known fact * * *."

Quite clearly, the facts relied upon by the government in this case fall short of even this test. Mrs. Bremer's liver ailment was not incurable and in fact she did not eventually die because of it. Her doctor was not prepared to say that her condition was so advanced that she would die very shortly, and he did not feel that he could render any opinion at all as to the expected duration of her life.

For the reasons stated, judgment will accordingly be entered in favor of the plaintiffs with interest. Counsel should agree on the amount of such judgment and present to the Court an appropriate order.