**The SHRINERS' HOSPITAL FOR CRIPPLED CHILDREN, a Colorado Corporation, as distributee under will of Sibyl C. Hooper, Deceased, and assignee of refund claim by Winters National Bank and Trust Company, duly appointed executor of Estate of Sibyl C. Hooper, Deceased**

v.

**The UNITED STATES.**

No. 410–76.

United States Court of Claims.

July 18, 1979.

---

* Plaintiff had paid the net amount of $298,184.12 due pursuant to the order of the Renegotiation Board on December 1, 1971.

We conclude that the Commissioner correctly valued the life estate, and we therefore deny the plaintiff's refund claim. Our conclusion accords with that of the Court of Appeals for the First Circuit in *Merchants Nat'l Bank v. United States*, 583 F.2d 19 (1st Cir. 1978), a case raising almost identical issues.

## I.

The will of Sibyl C. Hooper bequeathed the residue of her estate in trust, the income payable to her son, Emmett, for his life, and upon his death, the corpus to be distributed to several charities. Plaintiff, the Shriners' Hospital for Crippled Children of Lexington, Kentucky, was one of two equal residuary charitable beneficiaries under the will. Mrs. Hooper died on October 24, 1972, and Emmett died about 8 months later at age 47, before the estate tax return had been filed. The estate paid estate taxes of $62,087.31 and $1,862.62 in interest, based upon a charitable deduction computed by reducing the net fair market value of the trust property by the actuarial value of the son's life estate on the date of his mother's death.

The executors of Sibyl's estate subsequently filed a claim for refund asserting that the estate was entitled to a larger charitable deduction. The executors' contention, which the plaintiff repeats here, was that in computing the charitable deduction (1) there should have been no reduction of the charitable contribution for the value of the son's life estate and (2) that if any reduction for the life estate was proper, a Treasury regulation pursuant to which the deduction was calculated is invalid because inconsistent with provisions of the Internal Revenue Code of 1954. Upon the rejection of the claim for refund and the assignment of part of the claim to the plaintiff, this suit was filed.

## II.

Section 2055(a) of the Internal Revenue Code of 1954 generally permits a deduction from the value of the gross estate

William J. Lehrfeld, Washington, D. C., attorney of record, for plaintiff.

Iris J. Brown, with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and KUNZIG, Judges.

## OPINION

FRIEDMAN, Chief Judge.

This case, which is before the court on stipulated facts, involves the deduction that the federal estate tax permits for a bequest to a charitable remainderman following the termination of a life estate. The principal question is the proper valuation of the life estate where the life tenant dies before the federal estate tax return is due. Since the amount of the charitable deduction from the gross estate increases as the value of the life estate decreases, not surprisingly the plaintiff proposes a method of valuation of the life estate which produces a lower value than the Commissioner of Internal Revenue allowed.

under the federal estate tax for charitable bequests. Where, however, there is an intervening life estate before the charitable bequest matures, special rules apply. In 1969 Congress was concerned that estate tax deductions for charitable remainder bequests were being calculated in a manner that provided a deduction larger than the amount that actually passed to the charity. To remedy that situation, Congress enacted section 2055(e)(2) of the Code.

That section permits deductions for bequests to charitable remaindermen only if the bequest is accomplished through one of three precisely defined types of trust or fund: a charitable remainder annuity trust (defined in § 664(d)(1)), a charitable remainder unitrust (defined in § 664(d)(2)), or a pooled income fund (defined in § 642(c)(5)). In order to qualify as one of these three types of interest, the trust or fund must meet precisely defined conditions. One requirement that section 664(d)(1) imposes for a charitable remainder annuity trust—the type of trust in this case—to qualify for the charitable deduction is that "a sum certain (which is not less than 5 percent of the initial net fair market value of all property placed in trust) is to be paid" annually to a noncharitable beneficiary for life or for a term of not more than 20 years.

Because of the complexity of these new requirements, the Treasury Department promulgated regulations, which expired in 1972, that permitted wills and trusts created between 1969 and 1972 to be reformed after the death of the testator or grantor so as to qualify them for a deduction for the remainder interest passing to the charity. Treas.Reg. 1.664–1(f)(3), T.D. 7202, 1972–2 Cum.Bull. 313, 320. In 1974, Congress enacted § 2055(e)(3), with retroactive effect to January 1, 1970. That section largely mirrored the prior Treasury Regulations. It authorizes the amendment, prior to December 31, 1975 [1] but after the testator's or grantor's death, of wills executed and trusts

created before September 21, 1974,[2] to enable the charitable remainder to qualify for the estate tax deduction that section 2055(e)(2) permits. In other words, the interested parties may amend the trust to bring it into compliance with the requirements of sections 642(c)(5), 664(d)(1) or (2).

Section 2055(e)(3) further provides that if, during this period and by the date for filing the estate tax return, the interest in property had passed directly to a charity, "a deduction shall be allowed as if the governing instrument was amended or conformed under this paragraph." The trust Mrs. Hooper's will created did not qualify the remainder gift to the charity for a charitable deduction because, among other things, it did not provide for an annual payment to her son of at least 5 percent of the initial net value of the trust assets; it merely provided for payment to him of "the income" of the trust. Since her son Emmett's death prior to the filing of the estate tax return for her estate meant that the property had passed directly to the charity when the return was filed, the trust was deemed to have been reformed into a charitable remainder trust that met the guidelines of section 664(d)(1), pursuant to regulations of the Commissioner of Internal Revenue (see infra pp. 307–308). Accordingly, the estate was entitled to a charitable deduction.

The issues in this case are (1) whether Emmett's life estate should even be considered in determining the estate's charitable deduction, and (2) if it is to be considered, the method by which it is to be valued. As noted, the higher the value of the life estate, the lower the amount of the charitable deduction and, conseᵫuently, of the bequest to the charity.

### III.

█ The plaintiff first contends that the estate's charitable deduction should not be

**1.** That date was extended to December 31, 1978. Revenue Act of 1978, Pub.L.No.95–600, § 514(a), 92 Stat. 2883 (1978).

**2.** That date was extended to December 31, 1977, Tax Reform Act of 1976 Pub.L.No.94–455, § 1304(a), 90 Stat. 1715 (1976), and was left unchanged in the Revenue Act of 1978, supra.

reduced at all by the value of Emmett's life estate. It relies upon section 2055(a), which provides that the value of the taxable estate should be determined by deducting from the value of the gross estate the

> amount of all bequests, legacies, devises or transfers [to charity] (including the interest which falls into any such bequest, legacy, devise or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return)

. . . . .

Property passing to charity as a result of such an irrevocable disclaimer would increase the estate's charitable deduction by that amount. In 1954, Congress amended section 2055(a) to provide:

> For purposes of this subsection, the complete termination before the date prescribed for the filing of the estate tax return of a power to consume, invade, or appropriate property for the benefit of an individual before such power has been exercised by reason of the death of such individual or for any other reason shall be considered and deemed to be an irrevocable disclaimer with the same full force and effect as though he had filed such irrevocable disclaimer.

Plaintiff argues that under this amendment, the death of the life income beneficiary Emmett prior to the date for filing the estate tax return operated as a disclaimer of his income interest, so that the value of his interest "falls into" the value of the property passing to the charity. It urges that the life income beneficiary had the "power to consume, invade or appropriate property for the benefit of an individual" (himself) which terminated on his death, so that the estate's charitable deduction should be determined as if the entire residuary bequest under the will had passed exclusively to charity.

Neither the language nor the legislative history of the 1954 amendment of section 2055 supports this contention. The interest that a life beneficiary has in the property—

the right to receive the income from it during his life—ordinarily would not be viewed as "a power to consume, invade or appropriate" the property. *See Merchants Nat'l Bank v. United States, supra,* 583 F.2d at 21. In a trust situation, the "power to consume, invade, or appropriate" to which the section refers is the power of the trustee to invade the corpus to meet the life beneficiary's needs, not the right of the beneficiary to receive the income from the property. Indeed, entitlement to income is not viewed as a power, but as a right.

■ The legislative history of the 1954 amendment demonstrates that the death of a life tenant before the estate tax return is filed does not constitute an irrevocable disclaimer of the life interest. The 1954 amendment resulted from congressional concern about the case of Solomon Allinger. His will created a trust to pay the income to a life tenant, followed by a charitable remainder. The trustee had complete discretion to invade the corpus for the benefit of the life tenant. *Hearings on H. R. 8300 (Part I) Before the Senate Comm. on Finance,* 83d Cong., 2d Sess. 293–95 (1954) [hereinafter cited as *Senate Hearings*]. The income beneficiary died shortly after the testator and before the trustee had made any payments. Had the income beneficiary lived, the trustee's power of invasion would have rendered the value of the charitable remainder so uncertain that no charitable deduction would have been allowed the estate. *Merchants Nat'l Bank v. Comm'r,* 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943); *Henslee v. Union Planters Nat'l Bank & Trust Co.,* 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949).

The purpose of the 1954 amendment was to treat the death of the life tenant as terminating, and thereby disclaiming, the trustee's power to invade the corpus, thus enabling the estate to obtain a charitable deduction. The sponsors of the measure recognized that such deduction would be reduced by the value of the intervening life estate. *Senate Hearings, supra,* at 293–95. There is no indication, however, that Congress intended the death of the life tenant

to operate as a disclaimer of the life estate itself, so that the value of that life estate would not reduce the charitable deduction.

 In the present case Mrs. Hooper's will authorized the trustee to invade corpus if necessary to maintain and support the life tenant. The effect of the 1954 amendment was to treat the life beneficiary's death as a disclaimer of the trustee's power to invade the corpus, and thereby to enable the estate to obtain a charitable deduction it otherwise might not have received. The amendment, however, did not authorize the estate to ignore the value of the life estate in calculating the amount of that charitable deduction.

## IV.

A. In valuing Emmett's life estate, the Commissioner applied the Temporary Estate Tax Regulations he had promulgated pursuant to section 2055(e)(3) of the 1974 amendments. That section authorizes him to issue regulations which "provide for the application of the provisions of this paragraph to trusts whose governing instruments are amended or conformed in accordance with this paragraph" and further stated that "such regulations may provide for any adjustments in the application of . . subchapter J." Subchapter J governs estate taxes, and includes sections 642 and 664, which define the trusts that qualify for deductions for bequests to charitable remaindermen.

Temporary Estate Tax Regulation 24.-1(h), T.D. 7393, 1976–1 Cum.Bull. 283, 285, provides that where a trust has been deemed conformed to enable it to take a charitable deduction, the amount of the deduction

> will be determined as if the transfer were a charitable remainder annuity trust which provides an annuity of 6 percent of the initial fair market value payable from the date of death.

Plaintiff contends that this regulation is invalid because it conflicts with section 664(e) of the Code, which requires that in valuing a charitable contribution the

remainder interest of a charitable remainder annuity trust or charitable remainder unitrust shall be computed on the basis that an amount equal to 5 percent of the net fair market value of its assets (or a greater amount, if required under the terms of the trust instrument) is to be distributed each year.

Plaintiff argues that under section 664(e) the value of the charitable remainder must be computed on the basis of a 5 percent annual payment, unless the will requires a greater amount; that since Mrs. Hooper's will did not provide for any explicit rate of payment (but only that the income from the trust be paid to Emmett for life), section 664(e) required the Commissioner, in reforming the trust, to treat it as one in which the payment rate was 5 percent; and that section 664(e) therefore precluded the Commissioner from using a 6 percent rate.

 1. This argument rests upon a misconception of the authority the Commissioner exercises when he conforms a trust to enable it to qualify for a charitable deduction. In reforming the trust the Commissioner acts under section 2055(e)(3), and his function under the regulation is to change the trust to bring it into conformity with the requirement for a charitable remainder annuity trust under section 664(d)(1). Section 664(e) deals only with the method by which, after a trust has been reformed to qualify for a charitable contribution, the amount of that deductible contribution is to be determined.

Temporary Regulation 24.1(h) provides that when a nonqualifying trust is deemed conformed, it shall be treated as though it were a charitable remainder annuity trust. In order to qualify for a charitable deduction, the reformed trust must satisfy the standards that section 664(d)(1) requires for such trust. *See also* Treas.Reg. 1.664–2 (1972); Rev.Rul. 72–395, 1972–2 Cum.Bull. 340. One of these requirements is that there be annual payouts of "not less than" 5 percent of the initial net fair market value of the trust property. In conforming the trust the Commissioner therefore was required to provide an annual payment rate

of not less than 5 percent. Nothing in section 664(d)(1), however, precludes a charitable remainder annuity trust from having a greater payout rate; the statute sets only a minimum rate, not a maximum.

Temporary Regulation 24.1(h) states that the amount of a charitable contribution in a trust that has been reformed by operation of law will be determined as if the trust had a payout rate of 6 percent. In other words, the effect of the regulation is that the trust is conformed to the requirements of section 664(d)(1) by treating it as amended to provide, among other things, an annuity of 6 percent. Section 2055(e)(3) authorizes the Commissioner constructively to "amend . . . the governing instrument." One amendment the Commissioner made in the trust instrument by virtue of the regulation was to provide a 6 percent payout rate, which under section 664(d)(1) qualifies it as a charitable remainder annuity trust.

The Commissioner's increase of the rate in the trust from the 5 percent minimum specified in section 664(d)(1) to 6 percent was an appropriate exercise of his broad authority under section 2055(e)(3) to issue regulations which "provide for the application of the provisions of this paragraph to trusts whose governing instruments are amended or conformed" and which "may provide for any adjustments in the application of . . . subchapter J." As the court of appeals stated in rejecting the same argument in *Merchants Nat'l Bank v. United States, supra*, 583 F.2d at 23:

> We are unable to find this moderate administrative escalation of the statutory minimum interest [payout] rate either unreasonable or "out of harmony" with the statutory objective. The evil sought to be combatted by the 1969 legislation was the use of unrealistically low annuity rates for life beneficiaries, with the result that the value of charitable remainders was maximized while trustees easily exceeded the low annuity rates. H.Rep.No. 91–413, Part 1, 91st Cong., 1st Sess., p. 58 (1969–3 Cum.Bull. 200, 237). To have gone up from the 5 percent floor by 1 percent five years later, particularly in the absence of any evidence that this was unrealistic, seems well within any leeway which existed. That there must be some leeway would seem necessary if the statute's workability were not to depend on yearly amendment.

\* \* \* \* \* \*

The 6 percent payout rate for nonconforming trusts that are automatically conformed to become qualifying charitable remainder annuity trusts applies only for the relatively brief period (originally until December 31, 1975, and now extended to December 31, 1978) during which testators, grantors, and parties in interest have not had an adequate opportunity to conform the trust to the requirements of section 2055(e). After the expiration of this interim period, the payment rate of qualifying trusts will have been set by the trust instrument. The Commissioner did not exceed his authority or abuse his discretion in using a 6 percent payout rate on a temporary basis for the interim period.

Section 664(e) merely specifies the method for valuing the charitable contribution in a charitable remainder annuity trust. As noted, it provides that the value "shall be computed on the basis that an amount equal to 5 percent of the net fair market value of its assets (or a greater amount if required under the terms of the trust instrument) is to be distributed each year." Since in conforming the trust the Secretary has provided for a payout rate of 6 percent, the use of that rate is in accord with section 664(e), because the "greater amount [than 5 percent] . . . [is] required under the terms of the trust instrument." Section 664(e) does not require the Secretary to use a 5 percent payout rate except in situations where the trust instrument originally provided a higher rate. It requires the use of whatever rate greater than 5 percent the trust instrument requires; here, as we have shown, the trust instrument as amended by the Commissioner requires a 6 percent payout rate.

Plaintiff's contention that the Commissioner must use the 5 percent payment rate in section 664(e) unless the trust instrument

originally provided a different rate is further undermined by its concession that if, prior to Emmett's death, Emmett, the charitable remaindermen, and the trustee had reformed the trust pursuant to section 2055(e)(3), they could have provided a 6 percent payment rate, which would then be the basis of valuation under section 664(e). Plaintiff thus recognizes that if the interested parties themselves amend the trust instrument, they may require a payment rate greater than 5 percent and a correspondingly greater valuation of the annuity. Plaintiff offers no convincing reason, however, why the Commissioner should not have the same power when he makes the conforming amendment which the parties no longer are able to make because the life beneficiary has died.

2. Plaintiff criticizes this analysis because it allegedly fails to distinguish between the payout rate on the annuity and the rate of return on the trust property. This argument requires a brief explanation of the method by which the present value of an annuity is calculated.

The first step is to determine the term of the annuity. In this case, as we show in part IV–B below, the Commissioner correctly used Emmett's actuarial life expectancy on the date of his mother's death. The second step is to calculate the annual annuity payment, by applying the payment rate to the total amount available for payment of the annuity. On the basis of the $419,-958.83 valuation of Mrs. Hooper's residual estate, Emmett would receive an annuity of $20,997.94 under a 5 percent payout and an annuity of $25,197.53 under a 6 percent payout.

■ The final step is to determine the present value of the annuity. This is done by discounting the future payments to calculate the amount which, together with the interest on that sum, will be sufficient over the term of the annuity to meet the projected payments. The discount rate used is the rate of interest the principal is expected to earn.

The discount rate and the payout rate serve different functions. As noted, the discount rate is used in valuing an annuity to ascertain the present value of annuity payments to be made in the future. Although the payout rate also is used in valuing an annuity—to determine the amount of the annuity payments before applying the discount rate—that is not its function under section 664(d) or (e). There the purpose of the prescribed minimum payout rate of 5 percent is to insure that a charitable remainder annuity trust that qualifies for a defendant deduction will not be structured so as to increase the charitable contribution by using an unrealistically low payout rate. See S.Rep.No.91–552, 91st Cong., 1st Sess. 1, 89–90, reprinted in [1969] U.S.Code Cong. & Admin.News, pp. 2027, 2119.

■ In valuing Emmett's annuity the Commissioner used valuation tables based upon a discount rate of 6 percent. Plaintiff argues that although the Commissioner may change the discount rate (as he did in 1970, when he raised it from 3½ to 6 percent), he cannot modify the 5 percent payout rate specified in section 664(e). This is but another formulation of plaintiff's basic argument that the Commissioner is bound by the 5 percent payout rate provided in section 664(e). As we have shown, however, the Commissioner's board power by regulation to make changes and adjustments in trust instruments to enable them to conform to the requirements of section 664(d)(1) authorizes him to incorporate a 6 percent payout rate in a reformed charitable remainder annuity trust.

Plaintiff has not shown, or even contended, that the 6 percent payment rate is economically unjustified or otherwise unreasonable. To the contrary, the use of that rate in this case is fully consistent with the 6 percent discount rate the Commissioner used.

The assumption underlying the latter figure is that, during the term of the annuity, the principal of the trust will earn 6 percent. Since the trust income was required to be paid to the life beneficiary, it was reasonable for the Commissioner to conclude that the payment rate on the annuity

also should be 6 percent. Any other percentage would favor either the life beneficiary or the charitable remainderman at the expense of the other—a result it cannot be assumed the testator would have intended. Both the House Committee Report on the 1969 Act (H.R.Rep.No.91–413, 91st Cong., 1st Sess. 1, 59, *reprinted in* [1969] U.S.Code Cong. & Admin.News., pp. 1645, 1705) and the First Circuit in *Merchants Nat'l Bank v. United States, supra,* 583 F.2d at 23, assumed that the discount rate (3½ percent in 1969) was the same rate that a trust would pay to the income beneficiary.

■ B. Plaintiff also challenges the requirement in the Temporary Estate Tax Regulations that the value of the annuity be determined on the basis of the annuitant's actuarial life expectancy on the date of the testator's death. It points out that the automatic reformation of the trust instrument that section 2055(e)(3) authorizes will take place only if the noncharitable life beneficiary dies before the filing date of the estate tax return, which is 9 months (unless extended) after the testator's death. It argues that it is unreasonable for the regulation to value the charitable remainder on the basis of the life beneficiary's actuarial life expectancy instead of his actual life, which will be known when the trust instrument is reformed. It asserts that this method of valuation is contrary to the congressional intent in section 2055(e) to benefit charities.

The First Circuit in *Merchants Nat'l Bank* properly rejected this argument. It pointed out (583 F.2d at 23) that the purpose of the statute

> is to allow time for the conforming of trust instruments to the law so that gifts to charities may qualify for deductions authorized. That is, the aim was to put wills and trusts in the position where, had there been adequate time and study, they would have been. The aim was not to

put the charity recipients in a *better* position. But that would be the effect if we adopted the estate's position; we would be singling out the testamentary charitable bequests made during the transition years.

\* \* \* \* \* \*

Plaintiff's argument produces the anomalous result that the charitable deduction would be greater if the trust were automatically reformed because the life beneficiary died before the estate tax return was filed than it would be if the testator, grantor, or parties in interest made the identical reformation. There is no dispute that in the latter situations the value of the life income beneficiary's interest would be determined by reference to his actuarial life expectancy. This would be so whether the life beneficiary died one week, one month, or 20 years after the testator.

There is no reason why Congress would have intended to give charities more favorable treatment where the right to any charitable deduction at all resulted from operation of law than where the parties in interest had acted to bring the trust instrument into compliance with the statute. Nor is it likely that Congress intended to prefer those trusts that were reformed, whether by the parties or by operation of law, only after the death of the testator or grantor. Yet this is the effect of plaintiff's position, since it concedes that if the trust is reformed while the life beneficiary is alive or if the instrument conforms in the first instance, it is proper to use the beneficiary's actuarial life expectancy. We see no ground for invalidating a regulation that merely incorporates the traditional valuational rules for life estates. *Cf. Ithaca Trust Co. v. United States,* 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929); *McMurtry v. Comm'r,* 203 F.2d 659, 667 (1st Cir. 1953).[3]

---

**3.** Plaintiff raises, but does not argue, the point that the provisions in section 2055(e)(3) denying interest for the first 180 days following the filing of a refund claim based upon the reformation of a trust is unconstitutional. We recently rejected that claim in *First Nat'l Bank v. United States,* 571 F.2d 21, 215 Ct.Cl. 609,

*cert. denied,* 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978). The First Circuit approved that decision in *Merchants Nat'l Bank v. United States, supra,* 583 F.2d at 24. The point is not presented here, since we deny plaintiff any refund.

Plaintiff is not entitled to any refund of the estate taxes paid by Mrs. Hooper's estate. The petition is dismissed.